

1   John A. Michaels, NC Bar No. 7905
    Paul Michaels, NC Bar No. 5751
2   MICHAELS & MICHAELS, PA
    107 Glenwood Avenue
3   Raleigh, North Carolina 27603
    Telephone: (919)582-2100
4   Facsimile: (919)582-2141

5   Attorneys for Plaintiffs

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                      (SAN FRANCISCO DIVISION)

11  IN RE: BEXTRA AND CELEBREX          MDL No. 1699
    MARKETING SALES PRACTICES AND
12  PRODUCT LIABILITY LITIGATION

13  ─────────────────────────────        C 07 45061

14  CAROL FLANAGAN CONWAY,               Case No. _____
    individually, and SHELTON CONWAY,
15  spouse,

16              Plaintiffs,              **CIVIL COMPLAINT**

17  v.                                   **JURY TRIAL DEMANDED**

18  PFIZER, INC., PHARMACIA
    CORPORATION, and G.D. SEARLE LLC,
19  (FKA G.D. SEARLE & CO.),

20              Defendants.

21

22        CAROL FLANAGAN CONWAY, individually, and her husband SHELTON CONWAY,

23  Plaintiffs, by and through their undersigned counsel, bring this action for damages against

24  Defendants PFIZER, INC., PHARMACIA CORPORATION, and G.D. SEARLE LLC, (FKA

25  G.D. SEARLE & CO.) (hereafter "Defendants") for damages arising from Defendants' design,

26  manufacture, sale, testing, marketing, advertising, promotion, and/or distribution of the unsafe

27  prescription anti-inflammatory drugs Celebcoxib, trade name CELEBREX® ("CELEBREX")

28  and Valdecoxib, trade name BEXTRA® ("BEXTRA").

519642. 1518996. 1511974.1                                      COMPLAINT

1    **I.    PARTIES**

2         1.    Plaintiffs are, and were at all relevant times, married and adult resident

3    citizens of the State of North Carolina, residing at 208 Bracken Court, Raleigh, North Carolina,

4    27615, in Wake County. (Unless otherwise specified herein, the term "Plaintiff" as used in the

5    singular refers to, Plaintiff, Carol Flanagan Conway.)

6         2.    Defendant PFIZER, INC. ("PFIZER") is a Delaware corporation with its

7    principal place of business in New York, New York. On July 16, 2002 PFIZER announced its

8    proposed acquisition of PHARMACIA CORPORATION ('PHARMACIA"). On April 16, 2003,

9    PFIZER completed its $60 billion acquisition of PHARMACIA. At all relevant times, PFIZER

10   and/or its predecessors in interest were engaged in the business of designing, testing,

11   manufacturing, packaging, marketing, distributing, promoting, and selling CELEBREX and

12   BEXTRA throughout the United States.

13        3.    Defendant G.D. SEARLE LLC, (FKA G.D. SEARLE & CO.)

14   ("SEARLE") is a Delaware corporation with its principal place of business in Illinois. In April

15   2000 SEARLE was acquired by PHARMACIA, and became a wholly-owned subsidiary of

16   PHARMACIA. SEARLE was a wholly-owned subsidiary of PHARMACIA and is now a

17   wholly-owned subsidiary of PFIZER. At all relevant times, SEARLE has been engaged in the

18   business of designing, testing, manufacturing, packaging, marketing, distributing, promoting, and

19   selling CELEBREX and BEXTRA throughout the United States.

20        4.    Defendant PHARMACIA is a Delaware corporation with its principal

21   place of business in New Jersey. PHARMACIA was created in April 2000 through the merger of

22   Pharmacia & Upjohn with Monsanto Company and its G.D. SEARLE unit. PHARMACIA is

23   now a wholly-owned subsidiary of PFIZER. At all relevant times, PHARMACIA, and its

24   predecessors in interest have been engaged in the business of designing, testing, manufacturing,

packaging, marketing, distributing, promoting, and selling CELEBREX and BEXTRA throughout the United States.

5.    In engaging in the conduct alleged herein, each Defendant acted as the agent for each of the other Defendants or those Defendant's predecessors in interest.

## II.    **JURISDICTION AND VENUE**

6.    This Court and the Eastern District of North Carolina to which plaintiffs will seek remand for trial have subject matter jurisdiction over this matter pursuant to 28 U.S.C.A. § 1332 (diversity jurisdiction). The amount in controversy exceeds $75,000.00 and there is complete diversity of citizenship between Plaintiff and Defendants.

7.    Venue is proper in this District and in North Carolina pursuant to 28 U.S.C.A. § 1391. Defendants marketed, advertised and distributed the dangerous product in this district and in North Carolina, thereby receiving substantial financial benefit and profits from sales of the dangerous product in this district and in North Carolina, and reside in this district and in North Carolina under 28 U.S.C.A. § 1391(c), such that venue is proper.

8.    Defendants at all times relevant hereto designed, developed, manufactured, promoted, marketed, distributed, tested, warranted and sold CELEBREX and BEXTRA in interstate commerce. Defendants do substantial business in the States of North Carolina and California and within this District, advertise in this district and in North Carolina, receive substantial compensation and profits from sales of CELEBREX and BEXTRA in this District and in North Carolina, and made material omissions and misrepresentations and breaches of warranties in this District and in North Carolina so as to subject them to in *personam* jurisdiction in this District and in North Carolina.

## III.    **INTERDISTRICT ASSIGNMENT**

9. Assignment to the Northern District of California, San Francisco Division, is proper pursuant to MDL-1699, Pretrial Order No. 2 dated December 13, 2005, as this action is related to *In Re: Bextra and CELEBREX Marketing Sales Prac. and Pro. Liab. Lit.,* MDL-1699, assigned to the Honorable Charles R. Breyer by the Judicial Panel on Multidistrict Litigation on September 6, 2005.

10. Typically, venue for this case would lie in the Eastern District of North Carolina. Due to multi-district consolidation, Plaintiffs have filed their case directly in MDL-1699, but plaintiffs reserve their rights to have this action remanded to the EDNC for trial.

## IV.    FACTUAL BACKGROUND

11. Plaintiff was prescribed and began taking 200mg of CELEBREX daily on or about August 1, 2003 for a period of approximately 7 and a half months for treatment of chronic bilateral osteoarthritis in her knees.

12. Plaintiff also took 10 mg of BEXTRA in the weeks before she started CELEBREX and took 50 mg of VIOXX for almost 2 years before starting Defendants' products.

13. As a direct and proximate result of using CELEBREX and BEXTRA, Plaintiff suffered severe cerebrovascular injuries on March 11, 2004 in the form of a stroke due to a bilateral infarct of her anterior thalami.

14. Unaware of the risks presented by CELEBREX, Plaintiff continued to take CELEBREX until the day of her stroke, after which time she was instructed to stop CELEBREX.

15. Plaintiff was unaware of the connection between her stroke and Defendants' products until the news about the "thrombotic" risks of Cox II inhibitors came to light after VIOXX was taken off the market in late September of 2004.

16. Plaintiff and Plaintiff's healthcare providers were at the time of Plaintiff's stroke and initial injury unaware—and could not have reasonably known or have learned through

reasonable diligence—that such injury directly resulted from Plaintiff's ingestion of CELEBREX and Defendants' negligent and otherwise culpable acts, omissions, and misrepresentations.

17.    Plaintiff used CELEBREX and BEXTRA in a proper and reasonably foreseeable manner and used them in a condition that was substantially the same as the condition in which they were manufactured and sold.

18.    Plaintiff would not have purchased and used CELEBREX or BEXTRA had Defendants properly disclosed the risks associated with the drugs, as plaintiff was unaware of the risk from CELEBREX prior to her use of the drug.

19.    Celecoxib was developed in 1998 by SEARLE and marketed jointly by SEARLE and PFIZER under the brand name CELEBREX. SEARLE was acquired by PHARMACIA, which was then acquired by PFIZER, in part so that PFIZER could take full control of CELEBREX.

20.    Defendants and their predecessors in interest developed the drug Valdecoxib, under the trade name BEXTRA and filed for FDA approval of BEXTRA on January 16, 2001 for the (i) prevention and treatment of acute pain, (ii) treatment of primary dysmenorrhea, and (iii) relief of the signs and symptoms of osteoarthritis and adult rheumatoid arthritis.

21.    CELEBREX and BEXTRA are among a class of pain medications called non-steroidal anti-inflammatory drugs ("NSAIDs"). Aspirin, naproxed (trade name Aleve®), and ibuprofen (trade name Advil®) are examples of well-known NSAIDs.

22.    NSAIDs reduce pain and inflammation by blocking the body's production of pain transmission enzymes called cyclooxygenase, COX-1 and COX-2. COX enzymes trigger the sequential oxidation of various fatty acids to create prostaglandins. Prostaglandins are

important cogs in the physiology of pain, igniting hormone-like actions in the immediate vicinity of the cells that release them, thereby inducing inflammation, pain, and fever.

23.    Because COX enzymes and prostaglandins increase the pain associated with tissue injury, the synthesis of prostaglandins by cells of injured tissue becomes a reasonable target for pain-management drugs.

24.    Traditional NSAIDs like aspirin, ibuprofen and naproxen inhibit both COX-1 and COX-2 enzymes simultaneously, providing relief from inflammation and pain, but at the cost of potential adverse gastrointestinal effects, as the prostaglandins that are supported by COX-1 enzymes are involved in the production of gastric mucus which protects the stomach wall from the hydrochloric acid present in the stomach.  By blocking the COX-1 enzyme, the body's ability to protect gastric tissue is hampered and, as a result, can cause harmful gastrointestinal side effects, including stomach ulceration and bleeding.

25.    Defendants and other pharmaceutical companies set out to remedy these gastrointestinal side effects suffered by some NSAID users by developing "selective" inhibitors, called coxibs, which targeted only COX-2 production, thus (allegedly) allowing for proper maintenance of gastric tissue while still reducing inflammation.  Their development was based on the hypothesis that COX-2 was the source of prostaglandins E2 and I2, which mediate inflammation, and that COX-1 was the source of the same prostaglandins in the stomach lining.  By not inhibiting COX-1, whose products provide cytoprotection in the gastric epithelium, these coxibs were thought to decrease the incidence of gastric side effects when compared to traditional NSAIDS that inhibit both COX-1 and COX-2.

26.    In making this decision, however, Defendants and their predecessors in interest either intentionally ignored and/or recklessly disregarded current medical knowledge that selective COX-2 inhibition lowers prostaglandin I2 levels, the predominant COX-2 product

responsible for preventing platelet aggregation and clotting, while leaving thromboxane A2, the potent COX-1 platelet aggregator and vasoconstrictor, unaffected. By selectively inhibiting prostaglandin I2 without similarly suppressing its COX-1 counterpart, CELEBREX and BEXTRA exposed their users to a host of clot-related cardiovascular risks, including heart attack, stroke, and unstable angina.

27.     On June 29, 1998, SEARLE and PFIZER filed for FDA approval of Celecoxib, its first major COX-2 inhibitor drug, under the trade name CELEBREX. The FDA granted preliminary approval of the new drug on December 31, 1998 for the relief of signs and symptoms of adult osteoarthritis and rheumatoid arthritis. A year later, on December 23, 1999, the FDA granted accelerated approval of CELEBREX for a second indication; the reduction of intestinal polyps as an adjunct to endoscopy and surgery in patients with familial adenomatous polyposis (FAP), a rare genetic disorder.

28.     In late January 1999, following FDA approval, PFIZER publicly launched CELEBREX, their new "blockbuster" drug, in one of the largest direct-to-consumer marketing campaigns ever undertaken for prescription drugs. PFIZER's massive marketing campaign fraudulently and misleadingly depicted CELEBREX as a much safer and more effective pain reliever than less inexpensive traditional NSAIDs. Defendants and their representatives and agents misrepresented the safety profile of CELEBREX to consumers, the medical community, healthcare providers, and third party payors.

29.     The potential for cardiovascular risk of selective COX-2 inhibitors was known to Defendants before the FDA granted market approval of CELEBREX in December 1998. By 1997, and prior to the submission of the New Drug Application (the "NDA") for CELEBREX, Defendants were aware that, by selectively inhibiting only the COX-2 enzyme, CELEBREX altered the homeostatic balance between prostacylcin synthesis and thromboxane

and thereby increased the prothrombotic effects of the drugs, causing blood clots to form in those who ingested it. *See* Topol, E.J., *et al., "Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors,"* JAMA, August 22, 2001 at 954.

30.     Pharmacologist Dr. Garrett Fitzgerald of the University of Pennsylvania reported in an editorial published in *The New England Journal of Medicine* on October 21, 2004, that contemporaneous with Defendants' launch it was known that selective COX-2 inhibitors, such as CELEBREX, suppressed the formation of prostaglandin I-2 in healthy volunteers, inhibited platelet aggregation in vitro, and may predispose patients to myocardial infarction or thrombotic stroke. Fitzgerald, G.A., Patrono C., *"The Coxibs, Selective Inhibitors of Cyclooxygenase-2,"* N Engl J Med 2001;345:433-442.

31.     Early FDA updates in March and April of 1999 similarly acknowledged this known risk, but noted, based upon PFIZER's representations, that CELEBREX "does not affect platelet aggregation (clumping), an important part of the blood clotting process." *See* FDA Updates, *"New Arthritis Drug May Have Fewer Side Effects,"* FDA Consumer March-April 1999.

32.     Based on the studies performed on CELEBREX, other COX-2 inhibitors, and basic research on this type of selective inhibitor which had been widely conducted, Defendants knew when CELEBREX and BEXTRA were being developed and tested that selective COX-2 inhibitors posed serious cardiovascular risks for anyone who took them, and presented a specific additional threat to anyone with existing heart disease or cardiovascular risk factors.

33.     Despite years of studies on selective COX-2 inhibitors, as well as the disturbing new studies specifically analyzing the risks of CELEBREX and BEXTRA, Defendants failed to take any action to protect the health and welfare of patients, opting instead to continue

promoting the drug for sale even after the FDA's Drug Safety and Risk Management Advisory Committee and Arthritis Drug Advisory Committee meetings.

34.    In September 1998, PHARMACIA sponsored an allegedly independent CELEBREX Long-Term Arthritis Safety Study ("CLASS"). The multicenter, double-blind, parallel group study sought to compare the incidence of clinically significant upper gastrointestinal events between CELEBREX 400 mg BID and Ibuprofen 800 mg.

35.    On September 13, 2000, Defendants released the results of the CLASS study in the *Journal of American Medicine*. Silverstein, F.E., *et al.*, *"Gastrointestinal Toxicity with Celecoxib vs. Nonsteroidal Anti-inflammatory Drugs for Osteoarthritis and Rheumatoid Arthritis: The CLASS Study: A Randomized Controlled Trial,"* 284 JAMA 1247 (2000). Researchers enthusiastically reported a "lower incidence of symptomatic ulcers and ulcer complications combined, as well as other clinically supported toxic effects, compared with NSAIDs at standard doses."

36.    Although Defendants touted the CLASS study as the primary evidence to support its theory that CELEBREX was safer for consumers who could not tolerate traditional NSAIDs in their gastrointestinal system, Defendants intentionally, recklessly and/or negligently concealed, suppressed, omitted, and misrepresented the results, risks and defects of the CLASS study. Among other things, Defendants failed to release the study's complete twelve month results, releasing only the first six months of trials, reported biased and misleading results, limited conclusions to upper gastrointestinal events despite other known risks factors, and understated known cardiovascular risks.

37.    Despite Defendants' favorable CLASS Study conclusions, no other reviewing or administrative body was able to substantiate those findings. The FDA Medical Officer Review of the CLASS data found CELEBREX to be no more efficacious than other

traditional NSAIDS comparators. *See generally*, FDA Medical Officer Review, NDA 20-998/S-009 submitted to the FDA by SEARLE on June 12, 2000. According to the FDA's review of the CLASS data: "Celecoxib did not demonstrate any statistical superiority to NSAIDs (pooled) or either comparator (diclofenac and ibuprofen) with regards to the primary safety endpoint of CSUGIE (Clinically Significant Upper Gastrointestinal Adverse Events) at any point in the trial although there were trends that favored celecoxib." (FDA CLASS Review).

38.    The FDA Arthritis Advisory Committee similarly found no "clinically meaningful" safety advantage of CELEBREX over older NSAIDs. (FDA CDER Arthritis Advisory Committee, February 7th and 8th, 2001, Gaithersburg, Maryland). The CLASS Study failed to demonstrate a superior safety record over ibuprofen or pooled NSAID data. Based on this information, the Committee advised that further studies be done to assess the risk of COX-2 drugs and NSAIDS when taken with aspirin.

39.    In a June 2002 editorial, the *British Medical Journal* chastised the Study's "misleading" and "seriously biased" nature; noting that the complete results "clearly contradict[ed] the published conclusions," and warning against the dangers of "overoptimistic," "short-term" data and "post hoc changes to the protocol." Juni, Peter, *et. at., "Are Selective COX 2 Inhibitors Superior To Traditional Non Steroidal Anti-Inflammatory Drugs?"* BMJ 2002;324:1287-1288.

40.    The whole 12 months of CLASS study data showed that CELEBREX offered no gastrointestinal (GI) benefit. Almost all ulcer-related complications that had occurred during the second half of the CLASS trials were in users of CELEBEX. These results clearly contradict the published CLASS conclusions.

41.    Editors of the Journal of the American Medical Association (JAMA) and other medical experts were reportedly "flabbergasted" when they realized they had been "duped"

by only being provided with the first six months of CLASS data. Okie S., *"Missing data on Celebrex: Full study altered picture of drug,"* Washington Post 2001 Aug 5;Sect A:11. The *Washington Post* reported JAMA editors noting: "When all of the data were considered, most of CELEBREX's apparent [GI] safety advantage disappeared."

42.    Institutional bias also appeared to play a role in the Study's biased conclusions. According to the *Washington Post*, all sixteen CLASS authors were either employees of PHARMACIA or paid consultants of the company. Okie, S., *"Missing data on Celebrex: Full study altered picture of drug,"* Washington Post 2001 Aug 5;Sect A:11. Moreover, at least one author, Dr. M. Michael Wolfe, a gastroenterologist from Boston University, admits he was duped by PHARMACIA. In the summer of 2000, *The Journal of the American Medical Association* asked Wolfe to participate in the "six-month" trial. Wolfe found the study, tracking 8,000 patients over a six-month period, persuasive, and penned a favorable review, which helped to drive up CELEBREX sales. It was not until early the next year, while serving on the FDA's Arthritis Advisory Committee, that Wolfe learned the study had run for one year, not six months, as the company had originally led both Wolfe and the *Journal* to believe. *Id.* Here again, when the complete data was considered, most of CELEBREX advantages disappeared.

43.    Defendants also limited conclusions of the CLASS study to upper gastrointestinal events, despite other known risks factors, and understated known cardiovascular risks. A metastudy by the Cleveland Clinic published in the Journal of the American Medical Association analyzed data from two major studies, including CLASS, funded by the drug companies and two smaller ones—for cardiovascular risks. Debabrata Mukherjee, *et al., "Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors,"* 286 JAMA 954 (2001).) The metastudy found that PHARMACIA failed to identify and study cardiovascular risks for their

products. The annualized heart attack rates for patients taking Vioxx or Celebrex, the researchers found, were "significantly higher" than those in a group taking placebos. "The available data raise a cautionary flag about the risk of cardiovascular events with Cox-2 inhibitors," they concluded.

44.     "A total of 36 deaths occurred during the [CLASS] study or during post study follow-up: 19 in the celecoxib group, 9 in the diclofenac group and 8 in the ibuprofen group..... Most deaths were cardiovascular in nature." FDA CLASS Review at 54. The increased number of adverse cardiovascular events in the CELEBREX group was not surprising, as they were also revealed in the original New Drug Application (NDA) submitted for CELEBREX. "In the original NDA, myocardial infarction was noted to occur at a higher rate in celecoxib-treated as compared to placebo treated patients. In the long term trial (Trial 024) that was included in the NDA submission, the predominate (>90%) cause of death for patients taking celecoxib at any dose was cardiovascular."

45.     Public Citizen, a public watchdog organization, also reviewed the CLASS data in its entirety. A complete review reveals the combined anginal adverse events was 1.4% in the CELEBREX group versus 1.0% in either NSAID group. Specifically, the rate of heart attack in the CELEBREX was double that of the other two NSAIDs, 0.2% vs. 0.1%, respectively.

46.     Eric Topol of the Cleveland Clinic reached a similar conclusion, noting that the CLASS trail MI rate was 1.6% in CELEBREX group (at a dosage of 400 mg twice a day) and 1.2% in the ibuprofen group for the 1739 patients taking low-dose aspirin. Topol noted that this numerical excess, albeit not statistically signification, was also found in the 6229 patients not taking aspirin in the trial. Eric J. Topol, *Arthritis Medicines and Cardiovascular Events – House of Coxibs,"* JAMA 293:366. Based on this data, Topol and his colleagues concluded: "It is mandatory to conduct a trial specifically assessing cardiovascular morbidity." *Id.* Unfortunately,

no such trials were ever initiated, delaying the official warnings of CELEBREX and jeopardizing countless lives in the process.

47.    After CLASS, the FDA recommended a trial to specifically assess the cardiovascular risks of COX-2 inhibitors. The Adenoma Prevention with Celecoxib (APC) trial was intended to be this placebo-controlled trial of CELEBREX.

48.    In early 2000, the National Cancer Institute (NCI), in collaboration with SEARLE and PFIZER, initiated the Adenoma Prevention with Celecoxib (APC) trial, a randomized, double-blind, placebo-controlled study to discover the efficacy of CELEBREX in preventing the growth of pre-cancerous colon polyps. N.Eng. J. Med. 352;11 at 1072. The trial involved 2026 patients across the country with randomization to one of three groups: (1) placebo; (2) 200 mg CELEBREX twice daily; and (3) 400 mg CELEBREX twice daily. The patients, each of whom had an adenomatous polyp removed before enrollment, were followed up for a mean of 33 months while taking the study drug, with the primary objective of limiting the development of colorectal cancer.

49.    On December 17, 2004, the National Cancer Institute suspended the use of CELEBREX for all participants in the APC trial due to "significant excess of cardiovascular death, myocardial infarction (MI) and stroke." Eric J. Topol, *"Arthritis Medicines and Cardiovascular Events – House of Coxibs,"* JAMA 293:366. Analysis by an independent Data Safety Monitoring Board (DSMB) showed a two to three fold increased risk of major fatal and non-fatal cardiovascular events for participants taking the drug compared to those on a placebo with a secondary dose-response effect.

50.    The absolute excess of major cardiovascular events of 13/1000 patients at the 800 mg dose (400 mg 2x day) was strikingly similar to the results of trials with rofecoxib and valdecoxib, both selective NSAID COX-2 inhibitors removed for the market for their significant

cardiovascular risks.  Eric J. Topol, *"Arthritis Medicines and Cardiovascular Events – House of Coxibs,"* JAMA 293:366.

      51.    The dosage noted in the APC study is itself important for two reasons: first, there appears to be an association between dosage and the increase in adverse cardiovascular events; second, most patients increase dosage.  PFIZER knew patients were increasing their dosages as noted in the CLASS Study: "Interestingly ... up to 70% of patients increased their dose for celecoxib."  FDA CLASS Review at 74.  Thus, PFIZER was aware of "dosage creep."

      52.    Several other CELEBREX trials also gave Defendants insight into the cardiovascular risks presented by CELEBREX.  The Prevention of Spontaneous Adenomatous Polyps (PreSAP) trial identified the death rate from cardiovascular causes (heart attack, stroke, heart failure, angina, or need for CV procedure) as 3.6% with CELEBREX as compared to 2.7% for placebo.

      53.    Public Citizen also reviewed the results of Study IQ IQ5-97-02-001 which reflected "the combined rate of all serious cardiovascular adverse events in patients getting a placebo was 2.1% but was greatly increased in those getting celecoxib to 7.7%, a 3.6 fold increase in CV risk in those people taking celecoxib. (p=0.03)." *Public Citizen*, January 26, 2005, Dr. Sidney M. Wolfe.  According to Dr. Sidney Wolfe, "The study revealed a significantly increased rate (3.6-fold) of serious CV adverse events and more than a doubling in the rate of CV deaths in people using celecoxib compared to those using placebo." Id.

      54.    PFIZER also had access to other data which indicated a cardiovascular risk with its drugs.  Specifically, PFIZER had knowledge of two studies conducted by Merck related to its Cox-2 inhibitor Vioxx – Vioxx Gastrointestinal Outcomes Research (VIGOR) and Adenomatous Polyp Prevention (APPROVe).

55.    In 2000, The FDA Medical Officer Review of CLASS specifically noted the VIGOR trial and the concern over serious adverse cardiovascular events.

56.    According to VIGOR (near acronym for Vioxx Gastrointestinal Outcomes Research) Vioxx patients experienced 20% more serious clinical adverse events (statistically significant); they experienced 4.6 times more hypertension events serious enough to warrant discontinuation, 1.7 times more edema events, and 1.85 times as many congestive heart failure adverse events.  By two measures of cardiovascular events related to blood clots, Vioxx had twice the risk of naproxen and the results were considered statistically significant.

57.    In medical terms, the VIGOR results raised the question of whether selective inhibition of COX-2 was a monumental mistake from the start, and Defendants were aware of these results.

58.    Due to safety questions surrounding Vioxx, Merck designed another large scale trial, Adenomatous Polyp Prevention (APPROVe), which was intended to test the drug's ability to prevent or shrink colon polyps, but would also compare the cardiovascular safety of Vioxx to a placebo control.  According to the analysis conducted by Public Citizen of the APPROVe data: Vioxx "doubled the risk of any thrombotic cardiovascular event" and "doubled the risk of MI (myocardial infarction a/k/a heart attack). *Public Citizen*, January 24, 2005, at 15.

59.    Despite the available CELEBREX data and other information related to Vioxx, PFIZER never paused to reevaluate the CELEBREX data and studies.  The scientific data available during and after CELEBREX's approval process made clear to Defendants that their formulation of CELEBREX would cause a higher risk of blood clots, stroke and/or myocardial infarctions among CELEBREX consumers, alerting them to the need to do additional and adequate safety studies.

60.    Defendants engaged in similar conduct, with respect to BEXTRA, ignoring the potential for cardiovascular risk of selective COX-2 inhibitors, which was known to Defendants long before the FDA granted market approval in November 2, 2001.

61.    By 1997, and prior to the submission of the New Drug Application (the "NDA") for BEXTRA, Defendants were aware that, by inhibiting COX-2, BEXTRA altered the homeostatic balance between prostacylcin synthesis and thromboxane and thereby increased the prothrombotic effects of the drugs, causing blood clots to form in those who ingested it.  See Topol, E.J., *et al., Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors, JAMA,* August 22, 2001 at 954.  Although all COX-2 inhibitors have this mechanism of action, BEXTRA was the most selective COX-2 inhibitor proposed for approval.  Accordingly, it had the greatest potential to cause adverse cardiovascular and cerebrovascular events.

62.    As Pharmacologist, Dr. Garrett Fitzgerald, of the University of Pennsylvania, reported in an editorial published in *The New England Journal of Medicine* on October 21, 2004, it was known as early as 1999 that selective COX-2 inhibitors, such as BEXTRA, suppressed the formation of prostaglandin I-2 in healthy volunteers, inhibited platelet aggregation in vitro, and may predispose patients to myocardial infarction or thrombotic stroke.

63.    Nevertheless, on January 16, 2001, Defendants submitted an NDA to the FDA for BEXTRA, omitting information about the extent of the risks associated with BEXTRA. Without a complete picture of the potential hazards associated with the drug, the FDA approved BEXTRA on or about November16, 2001.

64.    Even without a label that allowed Defendants to legitimately claim superior safety, when Defendants, and their predecessors-in-interest, began marketing BEXTRA in early 2002, Defendants and their representatives and agents misrepresented the safety profile of BEXTRA to consumers, including Plaintiff, the medical community, healthcare providers, and

third party payers.  Defendants proceeded to promote, market, sell, and distribute BEXTRA as a much safer and more effective pain reliever than other NSAIDs, such as aspirin, naproxen, and ibuprofen.

65.     On December 9, 2004, the FDA issued new information on side effects associated with the use of BEXTRA and required the addition of certain warnings to, and the strengthening of other warnings on, the BEXTRA label.  The enhanced warnings followed in the wake of the results of additional cardiovascular studies performed by Defendants, as well as numerous complaints to the FDA regarding severe skin reactions.

66.     Yet well prior to this warning, Defendants had knowledge of the coronary and cardiovascular safety risks of BEXTRA from several studies.  *See e.g.*, Otto, E.O., *Efficacy and Safety of the Cyclooxygenase 2 Inhibitors Parecoxib and Valdecoxib in Patients Undergoing Coronary Artery Bypass Surgery, The Journal of Thoracic and Cardiovascular Surgery*, June 2003 at 1481.

67.     Even Defendants' own (and Pfizer funded) post-drug approval meta-analysis study (first presented on March 31, 2003 and again on May 15, 2003) included this data showing an increased cardiovascular risk in patients treated with BEXTRA after undergoing coronary artery bypass graft surgery.  Observed events included heart attack, stroke, and blood clots in the legs and lungs.  The results were particularly relevant and striking as each of the study participants who were a post-bypass surgery patient was taking anti-clotting agents at the time their exposure to BEXTRA was being tracked.

68.     Based on the studies performed on Celebrex, Vioxx, Bextra, and other COX-2 inhibitors, and basic research on this type of selective inhibitor which had been widely conducted, Defendants knew when CELEBREX and BEXTRA were being developed and tested that selective COX-2 inhibitors posed serious cardiovascular risks for anyone who took them, and

presented a specific additional threat to anyone with existing heart disease or cardiovascular risk factors.

69.    The prudent courses of action were two: not bring the drugs to market or perform additional trials to further assess the obvious increased risk of thrombosis, but Defendants failed to conduct the necessary trials before marketing CELEBREX and BEXTRA to humans.

70.    Such ineffective and unreasonably dangerous drugs could only be widely prescribed as a result of a tremendous marketing campaign. In addition to being aggressive, the Defendants' marketing campaign was fraudulent and misleading. But for fraudulent and misleading advertising, consumers, including the Plaintiff, would not have purchased CELEBREX and BEXTRA, costly prescriptive drugs that were ineffective for their intended purposes.

71.    Defendants' marketing was so fraudulent that the FDA issued three Warning Letters to Defendants in October 1999, April 2000, and November 2000, all finding that Defendants were unlawfully making false or misleading statements concerning the safety and/or efficacy of CELEBREX. The November letter cited two direct-to-consumer television advertisements that overstated the efficacy of CELEBREX. The FDA ordered that SEARLE immediately cease distribution of the misleading ads.

72.    On February 2001, the FDA issued a Warning Letter to PHARMACIA stating that promotional activities from marketing CELEBREX were unlawful because they were "false, lacking in fair balance, or otherwise misleading." The FDA found that CELEBREX had been promoted for unapproved uses, in unapproved dosing regiments, and that the marketers had made unsupportable claims that CELEBREX was safer and more effective than other NSAIDs.

73.    On January 10, 2005, the FDA again issued PFIZER a written reprimand for its promotional activities. The reprimand reads: "These five promotional pieces [3 CELEBREX and 2 Bextra] variously: omit material facts … and make misleading safety, unsubstantiated superiority, and unsubstantiated effectiveness claims."  Amid continued frustration with PFIZER's continually misleading marketing strategy and ever surmounting evidence of cardiovascular dangers, the FDA Advisory Panel voted overwhelmingly that the company should never again advertise the drug [CELEBREX]."

74.    At all times relevant herein, Defendants engaged in a marketing campaign with the intent that consumers would perceive CELEBREX and BEXTRA as safer and better drugs than other NSAIDs and, therefore, purchase CELEBREX and BEXTRA.

75.    Defendants widely and successfully marketed CELEBREX and BEXTRA throughout the United States by, among other things, conducting promotional campaigns that misrepresented the efficacy of CELEBREX and BEXTRA in order to induce a widespread use and consumption.  CELEBREX and BEXTRA were represented to aid the pain and discomfort of arthritis, osteoarthritis, and related problems.  Defendants made misrepresentations by means of media advertisements, and statements contained in sales literature provided to Plaintiff's prescribing physicians.

76.    Despite knowledge of the dangers presented by CELEBREX and BEXTRA, Defendants and Defendants' predecessors in interest, through their officers, directors and managing agents for the purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy the known defects of CELEBREX and BEXTRA and failed to warn the public, including Plaintiff, of the serious risk of injury occasioned by the defects inherent in CELEBREX and BEXTRA.  Defendants and their officers, agents and managers intentionally proceeded with the inadequate safety testing, and then the manufacturing, sale and marketing of

CELEBREX and BEXTRA, knowing that persons would be exposed to serious potential danger, in order to advance their own pecuniary interests. Defendants' conduct was wanton and willful, and displayed a conscious disregard for the safety of the public and particularly of Plaintiff.

77.     In an elaborate and sophisticated manner, Defendants aggressively marketed CELEBREX and BEXTRA directly to consumers and medical professionals (including physicians and leading medical scholars) in order to leverage pressure on third party payors, medical care organizations, and large institutional buyers (*e.g.*, hospitals) to include CELEBREX and BEXTRA on their formularies. Faced with the increased demand for the drug by consumers and health care professionals that resulted from Defendants' successful advertising and marketing blitz, third party payors were compelled to add CELEBREX and BEXTRA to their formularies. Defendants' marketing campaign specifically targeted third party payors, physicians, and consumers, and was designed to convince them of both the therapeutic and economic value of CELEBREX and BEXTRA.

78.     Defendants represented that CELEBREX and BEXTRA were similar to ibuprofen and naproxen but was superior because they lacked any of the common gastrointestinal adverse side effects associated with these and other non-steroidal anti-inflammatory drugs ("NSAIDS"). Defendants promoted CELEBREX and BEXTRA as safe and effective alternatives that would not have the same deleterious and painful impact on the gut, but that would be just as effective, if not more so, for pain relief.

79.     Yet, CELEBREX and BEXTRA possessed dangerous and concealed or undisclosed side effects, including the increased risk of serious cardiovascular events, such as heart attacks, unstable angina, cardiac clotting, deep vein thrombosis, hypertension, and cerebrovascular events, such as strokes. In addition, CELEBREX and BEXTRA, which were significantly more expensive than traditional NSAIDs, were actually no more effective than

traditional and less expensive NSAIDs and, just like traditional NSAIDs, carried a risk of perforations, ulcers, and gastrointestinal bleeding. Yet, Defendants chose not to warn about these risks and dangers.

80.     Defendants knew of these risks before the FDA approved CELEBREX and BEXTRA for sale, but Defendants ignored, downplayed, suppressed, omitted, and concealed these serious safety risks and denied inefficacy in its promotion, advertising, marketing, and sale of CELEBREX and BEXTRA. Defendants' omission, suppression, and concealment of this important information enabled CELEBREX and BEXTRA to be sold to, and purchased, or paid for by, the Consumers at a grossly inflated price.

81.     Because Defendants engaged in a promotional and marketing campaign that featured an advertising blitz directly targeted to consumers, that touted CELEBREX as a safer drug than other drugs in its class, while uniformly failing to disclose the health risks of CELEBREX, Defendants were able to justify pricing CELEBREX significantly higher than the cost of generic aspirin. In reality, that price inflation was not justified. Had Defendants disclosed the truth about CELEBREX, Defendants would not and could not have reaped the billions of dollars in CELEBREX and BEXTRA sales that were achieved as a direct result of the concealment, omission, suppression, and obfuscation of the truth.

82.     The Defendants intentionally, deliberately, knowingly, and actively concealed, omitted, suppressed, and obfuscated important and material information regarding the risks, dangers, defects, and disadvantages of CELEBREX and BEXTRA from Plaintiff, the public, the medical community, and the regulators. This concealment and omission was deliberate, knowing, active, and uniform, was intended to induce and maximize sales and purchases of CELEBREX and BEXTRA, and prevented Plaintiff from obtaining all the material

information that would be important to her decision as a reasonable person to purchase, pay for, and/or use CELEBREX and BEXTRA.

83.    Defendants' systematic, active, knowing, deliberate, and uniform concealment, omissions, suppression, and conduct caused Plaintiff to purchase, pay for, and/or use CELEBREX and BEXTRA; and caused Plaintiff's losses and damages as asserted herein.

84.    Had Defendants done adequate testing prior to approval and "market launch," the Defendants' scientific data would have revealed significant increases in stroke and myocardial infarction amongst the intended population of CELEBREX and BEXTRA consumers. Adequate testing would have shown that CELEBREX and BEXTRA possessed serious side effects. Defendants should have taken appropriate measures to ensure that their defectively designed product would not be placed in the stream of commerce and/or should have provided full and proper warnings accurately and fully reflecting the scope and severity of symptoms of those side effects should have been made.

85.    In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but Defendants intentionally suppressed this information in order for them to gain significant profits from continued CELEBREX and BEXTRA sales.

86.    Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch," and active concealment and failure to warn the medical community and general public of the known cardiovascular risks of CELEBREX and BEXTRA was particularly negligent, reckless and/or malicious given the drug's known target market.  Defendants were well aware that most patients taking CELEBREX and BEXTRA are elderly and have higher risk of developing cardiovascular risks to begin with.  Nearly half of the patients with arthritis have coexisting cardiovascular disease, and most patients, as discovered in the CLASS study, were prone to higher dosing.

87.    Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch" was based upon their desire to generate maximum financial gains for themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

88.    At the time Defendants manufactured, advertising, and distributed CELEBREX and BEXTRA to consumers including Plaintiff, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such increased risks were disclosed, consumers would not purchase CELEBREX, but instead would purchase other cheaper and safer NSAID drugs.

89.    In mid-January 2005, a peer-reviewed paper from the University of Pennsylvania found that in patients having heart bypass surgery, those who took Bextra in the intravenous form, parecoxib, as opposed to a placebo, were three times more likely to have a heart attack or stroke.

90.    From February 16-18, 2005, the FDA's Drug Safety and Risk Management Advisory Committee and the Arthritis Drug Advisory Committee met jointly to further examine the safety of COX-2 inhibitors.  There, FDA Office of Drug Safety Officer David Graham testified that selective COX-2 inhibitors increase the risk for adverse cardiovascular events at about the same rate as cigarette smoking, hypertension, and diabetes.

91.    Despite years of studies on selective COX-2 inhibitors, as well as the disturbing new studies specifically analyzing the risks of BEXTRA, Defendants failed to take any action to protect the health and welfare of patients, but instead, continued to promote the drug for sale even after the FDA's Drug Safety and Risk Management Advisory Committee and Arthritis Drug Advisory Committee meetings.

92.     On April 7, 2005, the FDA finally insisted that Defendants "voluntarily withdraw" Bextra from the U.S. market and issued a Alert for Healthcare Professionals, concluding that increased risk of serious cardiovascular events was unacceptable in light of it having no greater efficacy that other available NSAIDs.

93.     Based upon readily available scientific data, Defendants knew, or should have known, that their pre-approval testing of CELEBREX and BEXTRA did not adequately represent the cross-section of individuals who were intended consumers and therefore, likely to take CELEBREX and BEXTRA. Therefore, Defendants' testing and studies were grossly inadequate. Had Defendants done adequate testing prior to approval and market launch, rather than the extremely short duration studies done on the small size patient base that was actually done, the Defendants' scientific data would have revealed significant increases in incidence of strokes and myocardial infarctions among the intended and targeted population of CELEBREX and BEXTRA consumers. Adequate testing would have shown that CELEBREX and BEXTRA possessed serious side effects. Defendants should have taken appropriate measures to ensure that their defectively designed product would not be placed in the stream of commerce and/or should have provided full and proper warnings accurately and fully reflecting the scope and severity of symptoms of those side effects should have been made.

94.     In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but Defendants intentionally suppressed this information in order for them to gain significant profits from continued CELEBREX and BEXTRA sales.

95.     At the time Defendants manufactured, advertised, and distributed CELEBREX and BEXTRA to consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such increased risks were disclosed, consumers

would not purchase CELEBREX or BEXTRA, but instead would purchase other cheaper and safer NSAIDs.

## FIRST CLAIM FOR RELIEF
### Negligence

96.     Plaintiff incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein.

97.     Defendants owed Plaintiff a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, and selling CELEBREX and BEXTRA.  This duty included the duty not to introduce pharmaceutical drugs, such as CELEBREX and BEXTRA, into the stream of commerce that caused users to suffer from unreasonable, dangerous or untoward adverse side effects.

98.     At all relevant times to this action, Defendants owed a duty to properly warn Plaintiff and the Public of the risks, dangers and adverse side effects of their pharmaceutical drug CELEBREX and BEXTRA.

99.     Defendants breached their duties by failing to exercise ordinary care in the preparation, design, research, testing, development, manufacturing, inspection, labeling, marketing, promotion, advertising and selling of CELEBREX and BEXTRA, including:

(a)     failing to use due care in the preparation and development of CELEBREX and BEXTRA to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

(b)     failing to use due care in the design of CELEBREX and BEXTRA to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

(c)     failing to conduct adequate pre-clinical testing and research to determine the safety of CELEBREX and BEXTRA;

(d)     failing to conduct adequate post-marketing surveillance and exposure studies to determine the safety of CELEBREX and BEXTRA;

(e)     failing to completely, accurately and in a timely fashion, disclose the results of the pre-marketing testing and post-marketing surveillance and testing to Plaintiff, consumers, the medical community, and the FDA;

(f)     failing to accompany CELEBREX and BEXTRA with proper warnings regarding all possible adverse side effects associated with the use of CELEBREX and BEXTRA;

(g)     failing to use due care in the manufacture, inspection, and labeling of CELEBREX and BEXTRA to prevent the aforementioned risk of injuries to individuals who used CELEBREX and BEXTRA;

(h)     failing to use due care in the promotion of CELEBREX and BEXTRA to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

(i)     failing to use due care in the sale and marketing of CELEBREX and BEXTRA to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

(j)     failing to use due care in the selling of CELEBREX and BEXTRA to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

(k)     failing to provide adequate and accurate training and information to the sales representatives who sold CELEBREX and BEXTRA;

(l)     failing to provide adequate and accurate training and information to healthcare providers for the appropriate use of CELEBREX and BEXTRA; and

(m)     being otherwise reckless, careless and/or negligent.

100.    Despite the fact that Defendants knew or should have known that CELEBREX and BEXTRA caused unreasonable and dangerous side effects which many users would be unable to remedy by any means, Defendants continued to promote and market CELEBREX and BEXTRA to consumers, including Plaintiff, when safer and more effective methods of pain relief were available.

101.    Defendants were, or should have been had they exercised reasonable care, in possession of evidence demonstrating that CELEBREX and BEXTRA caused serious side effects. Nevertheless, they continued to market their products by providing false and misleading information with regard to the safety and efficacy of CELEBREX and BEXTRA.

102.    Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injuries as a result of their failure to exercise ordinary care as described above.

103.    As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein, the Plaintiff, sustained serious cerebrovascular injuries; has required and will require healthcare and services; has incurred and will continue to incur medical and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the future; has suffered and will continue to suffer mental anguish, diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other such damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff will continue to incur such losses in the future.

104.    Defendants' conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of

consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

105.    Plaintiff's spouse, SHELDON CONWAY, sustained a loss of consortium as a result of the injuries and damages sustained by Plaintiff incident to the use of CELEBREX and BEXTRA.  Plaintiff's spouse's damages include, but are not limited to, a loss of society, companionship, services, support, and care.  All such losses are permanent and continuing in nature.

**SECOND CLAIM FOR RELIEF**
**Breach of Express Warranty**

106.    Plaintiff incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein.

107.    Defendants expressly represented to Plaintiff and other consumers and the medical community that CELEBREX and BEXTRA were safe and fit for their intended purposes, were of merchantable quality, did not produce any dangerous side effects, particularly any unwarned-of side effects, and were adequately tested.

108.    These warranties came in the form of:

(a)    Defendants' public written and verbal assurances of the safety and efficacy of CELEBREX and BEXTRA;

(b)    Press releases, interviews and dissemination via the media of promotional information, the sole purpose of which was to create an increased demand for CELEBREX and BEXTRA, which failed to warn of the risk of injuries inherent to the ingestion of CELEBREX and BEXTRA, especially to the long-term ingestion of CELEBREX and BEXTRA;

(c)    Verbal and written assurances made by Defendants regarding CELEBREX and BEXTRA and downplaying the risk of injuries associated with the drug;

(d)    False and misleading written information, supplied by Defendants, and published in the Physician's Desk Reference on an annual basis, upon which physicians relied in prescribing CELEBREX and BEXTRA during the period of Plaintiff's ingestion of CELEBREX and BEXTRA, and;

(e)    advertisements.

109.    The documents referred to above were created by and at the direction of Defendants.

110.    Defendants knew or had reason to know that CELEBREX and BEXTRA did not conform to these express representations in that CELEBREX and BEXTRA are neither as safe nor as effective as represented, and that CELEBREX and BEXTRA produce serious adverse side effects.

111.    CELEBREX and BEXTRA did not and do not conform to Defendants' express representations because they are not safe, have numerous and serious side effects, including unwarned-of side effects, and cause severe and permanent injuries.

112.    Plaintiff, other consumers, and the medical community relied upon Defendants' express warranties.

113.    As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein, the Plaintiff sustained serious cerebrovascular injuries; has required and will require healthcare and services; has incurred and will continue to incur medical and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the future; has suffered and will continue to suffer mental anguish, diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, and other such damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician

care, monitoring, treatment, medications, and supplies. Plaintiff will continue to incur such losses in the future.

114.    Defendants' conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

115.    Plaintiff's spouse, SHELDON CONWAY, sustained a loss of consortium as a result of the injuries and damages sustained by Plaintiff incident to the use of CELEBREX and BEXTRA. Plaintiff's spouse's damages include, but are not limited to, a loss of society, companionship, services, support, and care. All such losses are permanent and continuing in nature.

### THIRD CLAIM FOR RELIEF
### Breach of Implied Warranty

116.    Plaintiff incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein.

117.    Defendants manufactured, distributed, advertised, promoted, and sold CELEBREX and BEXTRA.

118.    At all relevant times, Defendants knew of the use for which CELEBREX and BEXTRA were intended and impliedly warranted the products to be of merchantable quality and safe and fit for such use.

119.    CELEBREX and BEXTRA were not of merchantable quality and were not fit for their intended use, because they cause increased risk of serious cardiovascular and cerebrovascular adverse events, including heart attacks, strokes and other serious and harmful adverse health effects.

120.    Defendants breached the implied warranty that CELEBREX and BEXTRA were of merchantable quality and fit for such use in violation of N.C. General Statute § 25-2-314 *et seq.*

121.    Defendants were aware that consumers, including Plaintiff, would use CELEBREX and BEXTRA for treatment of pain and inflammation and for other purposes.

122.    Plaintiff and the medical community reasonably relied upon Defendants' judgment and expertise to only sell them or allow them to prescribe CELEBREX and BEXTRA only if it was indeed of merchantable quality and safe and fit for its intended use. Consumers, including Plaintiff, and the medical community, reasonably relied upon Defendants' implied warranties for CELEBREX and BEXTRA.

123.    CELEBREX and BEXTRA reached consumers, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendants.

124.    Defendants breached their implied warranty to consumers, including Plaintiff; CELEBREX and BEXTRA were not of merchantable quality or safe and fit for their intended use.

125.    As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein, the Plaintiff, sustained serious cerebrovascular injuries; has required and will require healthcare and services; has incurred and will continue to incur medical and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the future; has suffered and will continue to suffer mental anguish, diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other such damages. Plaintiff's

1    direct medical losses and costs include care for hospitalization, physician care, monitoring,

2    treatment, medications, and supplies.  Plaintiff will continue to incur such losses in the future.

3           126.    Defendants' conduct was committed with knowing, conscious, wanton,

4    willful, and deliberate disregard for the value of human life and the rights and safety of

5    consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so

6    as to punish Defendants and deter them from similar conduct in the future.

7

8           127.    Plaintiff's spouse, SHELDON CONWAY, sustained a loss of consortium

9    as a result of the injuries and damages sustained by Plaintiff incident to the use of CELEBREX

10   and BEXTRA.  Plaintiff's spouse's damages include, but are not limited to, a loss of society,

11   companionship, services, support, and care.  All such losses are permanent and continuing in

12   nature.

13

14                          **FOURTH CLAIM FOR RELIEF**
                  **Violation Of North Carolina Products Liability Act**
15                 **Failure To Warn In Violation Of N.C.G.S 99B-5**

16          128.    Plaintiffs re-allege the above.

17          129.    CELEBREX AND BEXTRA were manufactured, marketed, distributed,

18   and placed into the stream of commerce by Defendants in violation of N.C.G.S 99B-5.

19          130.    CELEBREX AND BEXTRA were unaccompanied by proper warnings

20   regarding risks associated with the use of it and the comparative severity and duration of such

21   risks.  The warnings given did not accurately reflect the symptoms and scope of severity of the

22   risks of adverse events, such as cardiovascular events, strokes, high blood pressure, congestive

23   heart failure and renal failure or insufficiency.  CELEBREX AND BEXTRA were

24

25   unaccompanied by proper warnings regarding the classes of potential consumers with pre-existing

26   health problems who were at risk for serious injury if they consumed the CELEBREX AND

27   BEXTRA.

28

131.    Defendants failed to perform adequate testing, and/or timely adequate testing, in that adequate testing would have shown that CELEBREX AND BEXTRA possessed risks of serious injuries with respect to which full and proper warnings accurately and fully reflecting the symptoms, scope and severity should have been made with respect to the use of this drug.

132.    Defendants also failed to reasonably analyze the results of what testing they did perform.

133.    Defendants also failed to reasonably analyze the results of testing, trials and studies performed by or on behalf of other Cox II inhibitor-type drugs and by others in the medical and pharmacological communities on this class of drugs.

134.    Defendants knew, or should have known, that CELEBREX AND BEXTRA were dangerously defective drugs which posed unacceptable risks of serious injury unknowable by the plaintiff. After Defendants knew or should have known of the risk of serious injury from CELEBREX AND BEXTRA use, they failed to provide adequate warnings to plaintiff and/or her physicians and continued to aggressively promote the dangerously defective product. Defendants failed to give warnings (1) that could reasonably be expected to catch the attention of a reasonably prudent person, in the circumstances that the product was used; (2) that were comprehensible to the average user; and (3) that conveyed a fair indication of the nature and extent of the danger. The failure to give these warnings rendered CELEBREX AND BEXTRA dangerous to an extent beyond that which would be contemplated by the ordinary users of the product with ordinary knowledge common to the community.

135.    Defendants acted unreasonably in failing to provide adequate warning or instructions to Ms. Conway and other users of CELEBREX AND BEXTRA. At the time CELEBREX AND BEXTRA left the control of the Defendants, the absence of adequate warnings

1    or instructions created an unreasonably dangerous condition that Defendants knew, or in the

2    exercise of ordinary care should have known, posed a substantial risk of harm to plaintiff.

3        136.    As a direct and proximate consequence of Defendants' failure to provide

4    adequate warnings and instructions, Plaintiff sustained serious cerebrovascular injuries and

5    related losses, and her husband suffered a loss of consortium as alleged herein. Plaintiff required

6    and will continue to require healthcare and services. Plaintiff has incurred and will continue to

7    incur medical and related expenses. Plaintiff also has suffered and will continue to suffer mental

8    anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished

9    quality of life, increased risk of premature death, and other losses and damages. Plaintiff's direct

10   medical losses and costs include care for hospitalization, physician care, monitoring, treatment,

11   medications, and supplies. Plaintiff has suffered loss of wages and/or wage-earning capacity.

12

13                    **FIFTH CLAIM FOR RELIEF**
14           <u>**Violations Of North Carolina Products Liability Act**</u>
             <u>**Inadequate Design Or Formulation In Violation Of N.C.G.S. 99B6**</u>
15

16       137.    Plaintiffs re-allege the above.

17       138.    Defendants acted unreasonably in designing or formulating CELEBREX

18   AND BEXTRA. The drugs' foreseeable risks exceeded the benefits associated with their design

19   or formulation. When they left Defendants' hands, CELEBREX AND BEXTRA's design or

20   formulation was so unreasonable that an ordinary consumer, aware of the relevant facts would not

21   have consumed them. Also, CELEBREX AND BEXTRA were more dangerous than other non-

22   Cox II inhibitor-type drugs of the NSAID class.

23

24       139.    If Plaintiff had been aware of the significant hazards and defects in the

25   CELEBREX AND BEXTRA, she would not have purchased or consumed CELEBREX AND

26   BEXTRA.

27

28

140.    CELEBREX AND BEXTRA were defectively designed because Defendants unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design or formulation which would have prevented or substantially reduced the risks of consumers, such as plaintiff, from experiencing heart attacks, strokes, renal failure, congestive heart failure and/or high blood pressure after ingestion of the drug.

141.    As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations, Plaintiff sustained serious cerebrovascular injuries and related losses and her husband suffered a loss of consortium as alleged herein.  Plaintiff required and will continue to require healthcare and services.  Plaintiff has incurred and will continue to incur medical and related expenses.  Plaintiff also has suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death and other losses and damages.  Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies.  Plaintiff has suffered loss of wages and/or wage-earning capacity.

## SIXTH CLAIM FOR RELIEF
### Fraudulent Misrepresentation & Concealment

142.    Plaintiff incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein.

143.    Defendants' superior knowledge and expertise, their relationship of trust and confidence with doctors and the public, their specific knowledge regarding the risks and dangers of CELEBREX and BEXTRA, and their intentional dissemination of promotional and marketing information about CELEBREX for the purpose of maximizing its sales, each gave rise to the affirmative duty to meaningfully disclose and provide all material information about CELEBREX and BEXTRA's risks and harms to doctors and consumers.

144.    Defendants made fraudulent affirmative misrepresentations with respect to CELEBREX and BEXTRA in the following particulars:

(a)    Defendants represented through their labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that CELEBREX and BEXTRA had been tested and found to be safe and effective for the treatment of pain and inflammation; and

(b)    Defendants represented that CELEBREX and BEXTRA were safer than other alternative medications.

145.    Defendants made affirmative misrepresentations; and fraudulently, intentionally and/or recklessly concealed material adverse information regarding the safety and effectiveness of CELEBREX and BEXTRA.

146.    Defendants made these misrepresentations and actively concealed adverse information at a time when Defendants knew or had reason to know that CELEBREX and BEXTRA had defects and were unreasonably dangerous and were not what Defendants had represented to the medical community, the FDA and the consuming public, including Plaintiff.

147.    Defendants omitted, suppressed and/or concealed material facts concerning the dangers and risk of injuries associated with the use of CELEBREX and BEXTRA including, but not limited to, the cardiovascular, cerebrovascular, and other serious health risks. Furthermore, Defendants' purpose was willfully blind to, ignored, downplayed, avoided, and/or otherwise understated the serious nature of the risks associated with the use of CELEBREX and BEXTRA in order to increase its sales.

148.    The representations and concealment were undertaken by Defendants with an intent that doctors and patients, including Plaintiff, rely upon them.

149. Defendants' representations and concealments were undertaken with the intent of defrauding and deceiving Plaintiff, other consumers, and the medical community to induce and encourage the sale of CELEBREX and BEXTRA.

150. Defendants' fraudulent representations evinced their callous, reckless, willful, and depraved indifference to the health, safety, and welfare of consumers, including Plaintiff.

151. Plaintiff's physician and Plaintiff relied on and were induced by Defendants' misrepresentations, omissions, and/or active concealment of the dangers of CELEBREX and BEXTRA in selecting CELEBREX and BEXTRA treatment.

152. Plaintiff and the treating medical community did not know that the representations were false and were justified in relying upon Defendants' representations.

153. Had Plaintiff been aware of the increased risk of side effects associated with CELEBREX and BEXTRA and the relative efficacy of CELEBREX and BEXTRA compared with other readily available medications, Plaintiff would not have taken CELEBREX and BEXTRA as she did.

154. As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein, the Plaintiff sustained serious cerebrovascular injuries; has required and will require healthcare and services; has incurred and will continue to incur medical and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the future; has suffered and will continue to suffer mental anguish, diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death and activation of latent conditions, and other such damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff will continue to incur such losses in the future.

155.    Defendants' conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

156.    Plaintiff's spouse, SHELTON CONWAY, sustained a loss of consortium as a result of the injuries and damages sustained by Plaintiff incident to the use of CELEBREX and BEXTRA.  Plaintiff's spouse's damages include, but are not limited to, a loss of society, companionship, services, support, and care.  All such losses are permanent and continuing in nature.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment providing the following relief:

1.    General damages in excess of the jurisdictional amount of this Court;

2.    Consequential damages;

3.    Punitive and exemplary damages;

4.    Treble damages on their unfair trade practice claim;

5.    Pre-judgment and post-judgment interest as provided by law;

6.    Recovery of Plaintiff's costs including, but not limited to, discretionary Court costs of these causes, and those costs available under the law, as well as expert fees and attorneys' fees and expenses, and costs of this action; and

7.    Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable in this action.

1    Dated: August 27, 2007                MICHAELS &MICHAELS, PA

2

3                                          By: _____
                                               John A. Michaels, NC Bar No. 7905
4

5                                          Paul Michaels, NC Bar No. 5751
                                           107 Glenwood Avenue
6                                          Raleigh, North Carolina 27603
                                           Telephone:  (919)582-2100
7                                          Facsimile:  (919)582-2141

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28